**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

POINTENORTH INSURANCE       :
GROUP,                      :
                            :
    Plaintiff,          :
                            :   CIVIL ACTION NO.
v.                          :   1:11-CV-3262-RWS
                            :
GWENDOLYN ZANDER, *et al.*, :
    Defendants.         :
                            :
                            :

## ORDER

    This case comes before the Court on Plaintiff's Motion for Preliminary Injunction [1] and Plaintiff's Motion to Remand [3]. After a review of the record and a hearing on the matter, the Court enters the following Order.

### I. Brief Factual Background

    On April 1, 2011, Plaintiff PointeNorth Insurance Group ("PointeNorth") acquired Risk Management Continuum, Inc. ("RMC").  Cmpl., Dkt. No. [1-1] at ¶ 8. Defendant Gwendolyn Zander was employed by RMC as a licensed insurance broker.  Id. After the merger, Zander remained employed by the

Plaintiff. On May 11, 2011, Zander signed an employment agreement, which contains in pertinent part the following provisions:

> 5. The parties acknowledge that (i) while employed by Employer, Employee has had or will have the opportunity to meet and know Employer's clients and methods of operations including the details of various plans and will have the opportunity to cultivate the loyalty and good will of such clients at substantial effort and expense to Employer: the Employer has a legitimate business interest in protecting and preserving the loyalty and good will of its clients; that such information is provided to Employee in confidence; (ii) Employer's insurance plans, lists of actual and potential customers and clients of Employer, along with all expirations and other records pertaining to insurance policies of Employer, are trade secrets as that term is defined by the Georgia Trade Secrets Act of 1990, as amended; (iii) Employee shall have remote access to all such information of Employer[.] The parties acknowledge that Employer derives substantial economic value from such information and from such information being kept confidential and not known to other parties.  Because of such economic value to be derived by Employer from such confidentiality, Employee agrees that **for a period of 24 months following any termination of this Agreement for any reason by either party, Employee will not:** (a) directly or indirectly **make known or divulge** the **names or addresses** of any of the existing or potential clients or customers of Employer or **any information pertaining to group plans or packages** provided by or serviced by Employer; (b) **will not solicit**, accept or attempt to solicit or accept, directly or by assisting others, business from **any of the Employer's clients which would be in competition with the products or services offered by the Employer, including actively sought prospective clients, with whom Employee had any contact or who were clients of Employer within the three months immediately preceding such termination of this Agreement**; and (c) Employee shall not access any of Employer's

information described herein or otherwise, and Employee agrees to
protect, keep secret, and safeguard any and all access codes of
Employer. . . Employee acknowledges that Employee's contact
with clients of the Employer and access to the client list of the
Employer are confidential and that the client contacts are
privileged for use for and on behalf of the Employer only.
 . . .
11. The parties hereby confirm that damages at law may be an
inadequate remedy for a breach or threatened breach of this
Agreement and agree that the respective rights and obligations
hereunder **shall be enforceable by specific performance,
injunction or other equitable remedy**, in addition to all remedies
provided hereunder or at law.  In the event Employer makes
application for an injunction or other equitable remedy, the parties
agree that the Employer shall **not be obligated to post a bond** or
other security therefore.

Empl. Agreement, Dkt. No. 1-1 at 35-36 (emphasis added).

On September 1, 2011, Defendant Zander terminated her employment

with Plaintiff. Cmpl., Dkt. No. [1-1] at ¶ 23. Zander created Defendant Risk

Management Providers ("RMP") and also affiliated herself with Defendant

Corporate Risk Advisors ("CRA"), Plaintiff's competitor.  Cmpl., Dkt. No. [1-

1] at ¶¶ 24, 27.  After Zander sent an email with her personal information to

unknown persons who may have included Plaintiff's clients and allegedly

retained Plaintiff's confidential information, Plaintiff filed suit in Cobb County

Superior Court asserting various state law and federal claims. Dkt. No. [1-1].

Defendant subsequently removed, and Plaintiff voluntarily dismissed the

AO 72A
(Rev.8/82)

federal question from its Complaint and moved to remand the case to Cobb County for lack of subject matter jurisdiction. Dkt. Nos. [1, 2, 3]. After a hearing was scheduled in the matter, Plaintiff then withdrew the voluntary dismissal.  Dkt. No. [4]. Plaintiff now comes to this Court seeking to enforce the employment agreement to prevent the Defendants from soliciting Plaintiff's clients and retaining any of Plaintiff's confidential information.

## II. Motion to Remand

Based on Plaintiff's assertions at the hearing and its withdrawal of its voluntary dismissal of its federal claim,[1] the Court finds Plaintiff's Motion to Remand [3] **IS MOOT**.

## III. Motion for Preliminary Injunction

Plaintiff moves for a preliminary injunction which would prevent Defendant Zander from using any information that she obtained while working for PointeNorth or RMC,[2] soliciting any former clients which she represented while working for PointeNorth or RMC, and would require the Defendants to

---

[1]The Court makes no finding about whether such a withdrawal works as an amendment under the Federal Rules of Civil Procedure and is using this action only as evidence of Plaintiff's consent to federal jurisdiction.

[2]This is not to include information which is readily available from alternative sources, such as the internet or elsewhere.

4

provide Plaintiff with immediate access to all computers and other data storage

sources that would contain any business information. It is settled law in this

Circuit that a preliminary injunction is an "extraordinary and drastic remedy[.]"

Zardui-Quintana v. Richard , 768 F.2d 1213, 1216 (11th Cir. 1985). To obtain

such relief, a movant must demonstrate:

> (1) a substantial likelihood of success on the merits of the
> underlying case, (2) the movant will suffer irreparable harm in the
> absence of an injunction, (3) the harm suffered by the movant in
> the absence of an injunction would exceed the harm suffered by the
> opposing party if the injunction issued, and (4) an injunction would
> not disserve the public interest.

Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242,

1246-47 (11th Cir. 2002).  The Court finds that a preliminary injunction is

appropriate in this case.

First, Plaintiff has shown a substantial likelihood of success on the

merits.

> Historically, Georgia has viewed restrictive covenants in
> employment contracts with extreme disfavor. In most situations,
> one faulty covenant in a contract voided the entire contract because
> Georgia courts have refused to use the "blue pencil" to edit the
> offensive covenant out of the contract.

> In 1990, the Georgia General Assembly passed legislation,
> codified at O.C.G.A. § 13–8–2.1, that sought to ease Georgia's
> policy against restrictive covenants. However, in Jackson & Coker,

5

Inc. v. Hart, the Georgia Supreme Court held that the statute was unconstitutional because Georgia's public policy was embodied in Georgia's Constitution, which provided, "The General Assembly shall not have the power to authorize any contract or agreement which may have the effect of or which is intended to have the effect of defeating or lessening competition, or encouraging a monopoly, which are hereby declared to be unlawful and void." 261 Ga. 371, 372, 405 S.E.2d 253, 255 (1991) (quoting GA. CONST. Art. III, § VI, ¶ V(c) (1983)).

In 2009, the General Assembly passed HB 173 (also codified at O.C.G.A. § 13–8–2.1), which was substantially the same legislation struck down in Jackson & Coker. To prevent the Jackson & Coker outcome, the General Assembly passed HR 178, a constitutional amendment that would change Georgia's public policy to recognize reasonable restraints in trade. The General Assembly made the effectiveness of the 2009 law contingent upon voter approval of the constitutional amendment, which the voters did at the November 2, 2010, general election.

Although the General Assembly successfully amended the Georgia Constitution, it apparently forgot to ensure the new amendment would become effective before the effective date of the 2009 law. House Bill 173 stated it would become effective on the day following the ratification of the constitutional amendment. However, the constitutional amendment did not contain an effective date, and pursuant to Art. X, § I, ¶ VI of the Georgia Constitution, it became effective January 1, 2011. Fearing the 2009 law would suffer the same fate as its predecessor, the General Assembly passed a similar bill, also codified at O.C.G.A. § 13–8–2.1, which became effective May 11, 2011.[3]

_____

[3]Section 1 to HB 30 states:
It has been suggested by certain parties that because of the effective date provisions of HB 173, there may be some question about the validity of that legislation. It is the intention of this Act to remove any such uncertainty by

6

> In sum, the 2009 law became effective November 3, 2010, but without the necessary constitutional foundation in place. The constitutional amendment changing Georgia's public policy became effective January 1, 2011. The legislation curing any constitutional defect became effective May 11, 2011.

Becham v. Synthes, 2011 WL 4102816, *3 (M.D. Ga. Sept. 14, 2011). Because the employment agreement which contains the non-solicitation and nondisclosure agreements was signed on May 11, 2011, that agreement is subject to the new legislation which allows this Court to blue pencil any overbroad or otherwise offensive passages.  Thus, while the Court finds the restrictive covenants overbroad in that they extend to "any of the Employer's clients"–not just the ones with whom Defendant Zander interacted–the Court may remedy that finding by blue penciling the provision to only apply to customers that the Defendant contacted and assisted with insurance.

Second, Plaintiff will suffer irreparable harm if no injunction is issued. If confidential information is used by or disseminated to the Defendants–who are in direct competition with the Plaintiff–the Plaintiff will likely lose its clients as well as the intrinsic value in the confidential information itself, information

---

substantially reenacting the substantive provisions of HB 173, but the enactment of this Act should not be taken as evidence of a legislative determination that HB 173 was in fact invalid.
2011 Ga. Laws Act 99 § 1.

7

which Plaintiff spent time and money to develop. Moreover, if the information is not preserved, Plaintiff would have to spend substantial time and effort to recreate that data.

As well, the balance of equities and public policy support an injunction. By preventing Defendants from using Plaintiff's confidential information and soliciting its clients, issuing an injunction would preserve the *status quo ante*. As well, based on the recent legislation, Georgia's public policy now supports the enforcement of restrictive covenants.

At the hearing, Defendant CRA argued that because Plaintiff has an adequate remedy at law–damages–an injunction should not issue in this case. However, Georgia courts have found when restrictive covenants are signed between an insurance agency and its agent, an injunction is appropriate as the loss of a customer is "difficult, if not impossible, to quantify." Poe & Brown of Ga., Inc. v. Gill, 492 S.E.2d 864, 865 (Ga. 1997). Plaintiff's Motion for Preliminary Injunction [1] is thus **GRANTED**.

Based on the foregoing, the Court **ORDERS** that the Defendants, their agents, servants, and employees are hereby **ENJOINED** from soliciting any of PointeNorth's customers with whom Defendant Zander had contact during her

8

employment or disclosing any confidential information Zander obtained during her employment.

Additionally, Defendant Zander is **ORDERED** to provide access to all computer applications, computers, hard drives, electronic storage devices, and any other storage forms which house business information compiled or utilized by Zander during her employment with PointeNorth and Risk Management Continuum to a mutually agreed upon independent computer examiner who will copy all data stored on those devices. This information should be provided to the computer examiner by Tuesday, October 11, 2011.

Counsel are **DIRECTED** to confer on search terms to be used by the computer examiner to search the data.  After completing the search, the computer examiner shall provide all data identified in the search to Defendant Zander.  If Defendant Zander objects to the production of any of the data to Plaintiff, Zander shall produce a log identifying the data to which she objects and the grounds for her objection.  Defendants and Plaintiff shall confer regarding the objections and seek to resolve any disputes.  If the Parties are unable to reach agreement, they may submit the issue to the Court.

### VI. Conclusion

Plaintiff's Motion to Remand [3] is now **MOOT**. Plaintiff's Motion for Preliminary Injunction [1] is **GRANTED**. Based on the foregoing, the Court **ORDERS** that the Defendants, their agents, servants, and employees are hereby **ENJOINED** from soliciting any of PointeNorth's customers with whom Defendant Zander had contact during her employment or disclosing any confidential information Zander obtained during her employment.

Additionally, Defendant Zander is **ORDERED** to provide access to all computer applications, computers, hard drives, electronic storage devices, and any other storage forms which house business information compiled or utilized by Zander during her employment with PointeNorth and RMC to a mutually agreed upon independent computer examiner who will copy all data stored on those devices. This information should be provided to the computer examiner by Tuesday, October 11, 2011.

Counsel are **DIRECTED** to confer on search terms to be used by the computer examiner to search the data.  After completing the search, the computer examiner shall provide all data identified in the search to Defendant Zander.  If Defendant Zander objects to the production of any of the data to

10

Plaintiff, Zander shall produce a log identifying the data to which she objects and the grounds for her objection.  Defendants and Plaintiff shall confer regarding the objections and seek to resolve any disputes.  If the Parties are unable to reach agreement, they may submit the issue to the Court.

**SO ORDERED** this  _29th_  day of September, 2011.


**RICHARD W. STORY**
United States District Judge

11